USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8-10-16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————

**DARRELL RAY WOODSON,**

                                     **Plaintiff,**

                    **- against -**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

                                 **Defendant.**

———————————————————

**OPINION AND ORDER**

**15-CV-2353 (RLE)**

**HONORABLE RONALD L. ELLIS, U.S.M.J.:**

## I.    INTRODUCTION

Plaintiff Darrell Ray Woodson ("Woodson") commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") benefits. The Parties consented to the jurisdiction of the undersigned on May 12, 2015, pursuant to 28 U.S.C. § 636(c). (Doc. No. 7.) Before the Court are the Parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Doc. Nos. 14 and 16.) Woodson seeks remand to the agency on the bases that: (1) the Administrative Law Judge ("ALJ") failed to properly weigh the medical evidence in this case; and (2) the ALJ failed to properly evaluate Woodson's credibility. (Plaintiff's Memorandum of Law in Support ("Pl. Mem.") at i.) The Commissioner argues that substantial evidence in the record supports the finding that Woodson was not disabled within the meaning of the Act during the period at issue, and asks the Court to affirm the Commissioner's decision (Defendant's Memorandum of Law in Support ("Def. Mem.") at 1.) For the reasons that follow, Woodson's motion is **GRANTED**, the Commissioner's cross motion is **DENIED**, and the case is **REMANDED**.

## II.   BACKGROUND

## A. Procedural History

Woodson applied for SSI benefits on February 25, 2011. (Transcript of Administrative Proceedings ("Tr.") at 251-59.) The Social Security Administration denied Woodson's request on May 25, 2011, and Woodson requested a hearing before an ALJ to review the determination. (*Id*. at 133-38, 40.) A hearing was held before ALJ Mark Solomon on February 24, 2012. (*Id.* at 54.) In a decision dated April 10, 2012, the ALJ determined that Woodson was not disabled within the meaning of the Act, and therefore not entitled to benefits. (*Id.* at 111-26.) In May 2012, Woodson sought review of the ALJ's determination by the Appeals Council. (*Id.* at 193.) On April 30, 2013, the Appeals Council remanded the case back to the ALJ to obtain Woodson's medical records. (*Id.* at 127-32.) The Appeals Council found that the record relied upon was "not completely developed," citing the ALJ's failure to obtain medical records from two of Woodson's treating psychiatrists. (*Id.* at 129.)

A second hearing was held before ALJ Solomon on August 14, 2013. (*Id.* at 37.) The ALJ rendered a decision on September 12, 2013, again finding that Woodson was not disabled within the meaning of the Act. (*Id. at* 21-36.) Woodson again sought review by the Appeals Council. (*Id.* at 16.) His application was denied on January 27, 2015, and the ALJ's September 12, 2013 decision became the final decision of the Agency. (*Id.* at 1-7.) Woodson initiated this action on March 30, 2015. (Doc. No. 1.)

## B.  Woodson's Testimony

### 1.   February 24, 2012 Hearing

Woodson was born on December 13, 1961. (Tr. at 58). He has completed the eleventh grade and has a GED. (*Id.*) He last worked in December 2006 as a truck driver for an online food

2

distributor. (*Id.* at 59.) The only other job he has worked in the past fifteen years was driving a school bus, which he did for five years. (*Id.*)

Woodson testified that he stopped working as a truck driver because he was having auditory hallucinations. (*Id.*) At the time, Woodson said that he was not taking his medication. (*Id.*) He testified that when he is on his medication, the auditory hallucinations subside. (*Id.* at 60). As of the February 24, 2012 hearing, Woodson was receiving medications from his psychiatrist every thirty days. (*Id.*) His medications at that time included Zolpidem, for sleep problems, and Wellbutrin, for depression. (Tr. at 64.) Woodson has a history of asthma. (Tr. at 60.) He testified that his last asthma attack was in July 2011. (Tr. at 61.) He was using a nebulizer and an Albuterol pump to treat his asthma. (*Id.*)

Woodson lives with his stepmother. (*Id.* at 63). He testified that he is able to bathe, clothe and feed himself, but his stepmother cooks and cleans for him. (*Id.*) Woodson does not travel outside his home without his stepmother accompanying him because he is paranoid and fears that he would be unable to get back home without her. (*Id.* at 63.) Generally, he spends his days reading and watching television, although he has issues concentrating during these activities. (*Id.*)

Woodson told the ALJ that he was incarcerated from September 2009 until February 2011, for possessing a controlled substance, but was on probation at the time of the hearing. (*Id.* at 61- 62.) He testified that he has used cocaine and alcohol, but not since 2007. (*Id.*)

### 2. August 14, 2013 Hearing

At the second hearing, Woodson testified that his medication had been increased since his first appearance before ALJ Solomon, and that his current medication was keeping him "more calm." (Tr. at 42) The increased dosage, however, makes him groggy. (*Id.* at 45.) As a result, he

3

takes two-hour naps once or twice each day. (*Id.*) Woodson still has issues concentrating. (*Id.*) For example, he stated that he tends to lose focus fifteen minutes into watching his favorite television program, causing him to "flip channels." (*Id.*)

Woodson testified that he begins his day helping his stepmother clean the house before taking his medication and "relax[ing]." (*Id.* at 42.) He prefers to stay at home and watch television during the day. (*Id.* at 43.) He still does not leave the house alone and prefers to travel with his stepmother. (*Id.* at 43.) He believes people are "out to get him" and this fear causes him to get into fights with people, although he has not been in a physical altercation since 2009. (*Id.* at 43, 46.)

## C.  Medical Evidence

### 1.  Harlem Hospital Center

The records reflects that Woodson was treated at Harlem Hospital Center ("Harlem Hospital") from 2007 through the date of the ALJ's final decision, with a gap in treatment between 2009 and 2011 corresponding to the timeframe during which Woodson testified to being incarcerated. (Tr. at 370-407.) Woodson was admitted for psychiatric treatment three times in 2007, twice in 2008, once in 2009, and once in 2011. (*Id.* at 428.) Since 2011, he has been receiving outpatient psychiatric treatment at Harlem Hospital.

During a month-long hospitalization in February 2007, doctors indicated that Woodson was experiencing increasingly severe suicidal thoughts. (*Id.* at 566.) He reported to the doctors that he began hearing voices in 2006 that told him, among other things, to kill himself. (*Id.*) In July 2007, he was hospitalized again, this time for three weeks, and was diagnosed with severe, recurrent major depressive disorder with psychotic behavior. (*Id.* at 570.) In May 2008, after a brief hospitalization, he was referred for inpatient rehabilitation. (*Id.* at 572.) On April 4, 2011,

4

Woodson was treated for unstable schizophrenia. (*Id.* at 378.) He was prescribed Risperidone and Ambien. (Tr. at 379.) Woodson was then referred to the psychiatric outpatient department for follow-up. (*Id.*)

Dr. Deepika Singh was the attending physician for Woodson's outpatient treatment in Harlem Hospital's psychiatry department. Dr. Singh completed a Treating Physician's Wellness Plan Report on June 30, 2011. (*Id.* at 511-14.) In the plan, Singh diagnosed Woodson with schizophrenia and depression, indicating that Woodson suffers from depressed mood, and auditory hallucinations, which tell him to hurt himself. (*Id.* at 513.) Dr. Singh opined that Woodson was unable to work for at least twelve months. (*Id.* at 512.)

On February 10, 2012, Dr. Taghogho Agarin, another psychiatrist at Harlem Hospital, completed a psychiatric impairment questionnaire, and Dr. Singh confirmed the findings therein. (*Id.* at 575, 600.) Dr. Agarin found that Woodson suffered from mood disturbance, emotional lability,[1] delusions, hallucinations, perceptual disturbances, and suicidal ideation or attempts. (Tr. at 576.) Dr. Agarin opined that Woodson experiences decompensation[2] while working because he has a low frustration tolerance and irritability. (Tr. at 580.) Woodson's current Global Assessment of Functioning Score ("GAF")[3] was 60, compared to a 55 the year before. (Tr. at 593.)

---

[1] "Emotional lability" refers to excessive emotional reactions and frequent mood changes. *See Emotional Lability,* MOSBY'S MEDICAL DICTIONARY (2009), http://medical-dictionary.thefreedictionary.com/emotional+lability (last visited on April 27, 2016).

[2] "Decompensation" refers to the appearance or exacerbation of a mental disorder due to failure of defense mechanisms. *See Decompensation,* FARLEX PARTNER MEDICAL DICTIONARY (2012), http://medical-dictionary.thefreedictionary.com/decompensation (last visited on April 27, 2016).

[3] A Global Assessment of Functioning Score is assigned by mental health professions when assessing a patient's mental functioning. The GAF is a scale from 0 to 100 where higher scores indicate greater levels of functioning. Optimal mental health and coping capabilities are represented by scores in the 91 – 100 range. A score of 61 - 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning. A score of 51 - 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS28 U.S.C. § 309.81 (Am. Psychiatric Ass'n 4th ed.) at 34.

5

The record contains treatment notes from Woodson's outpatient treatment at Harlem Hospital. For example, on August 26, 2011, Woodson told Dr. Clarisa Atencio that he had not heard voices since his Zyprexa prescription was increased, and the doctor noted that Woodson did not seem to be a danger to himself or others. (*Id.* at 665-66.) On October 21, 2011, Dr. Agarin diagnosed Woodson with "major depressive disorder, recurrent severe, with psychotic behavior," and found that he had GAF of 60, indicating moderate symptoms. (*Id.* at 691.) Two months later, however, at a December 21, 2011 appointment, Woodson showed Dr. Agarin self-inflicted burn wounds that Woodson claimed were the result of his auditory hallucinations. (*Id.* at 672.) The doctor noted that his GAF was 55. (*Id.* at 674.) By January 11, 2012, however, Dr. Agarin assessed that Woodson had a GAF of 70, in the mild symptom range. (*Id.* at 590.) The doctor diagnosed him with schizophrenia, and instructed him to continue his medications. (*Id.*)

Woodson continued to be seen at Harlem Hospital through at least 2013. During the early part 2012, treatment notes reflect that Woodson was stable. For example, on June 6, 2012, Dr. Efrain Acosta and Dr. Tummala Naidu found that Woodson had no new issues and was not a danger to himself or others. (*Id.* at 732-33.) In July 6, 2012, however, Dr. Naidu reported that Woodson seemed irritable, agitated, and anxious. (*Id.* at 725.) He increased Woodson's Zyprexa prescription to control the hallucinations. (*Id.* at 726.) On August 7, 2012 Woodson was seen by Willy Philias, M.D., and Raul Calicdan, M.D. (*Id.* at 709.) The doctors reported that Woodson had an easily irritable attitude and low frustration tolerance, and noted that his GAF had dropped to 50. (*Id.* at 710.)

On September 5, 2012, Woodson was seen by Dr. Singh and Dr. Uzoma Osuagwu. (*Id.* at 704.) The doctors noted that Woodson was adhering to his medication. They reported that although he was no longer hearing voices, he felt mildly depressed all the time. (*Id.* at 705)

6

Woodson had an irritable attitude and low frustration tolerance, and was diagnosed with schizoaffective disorder in remission. (*Id*. at 706-7.) Woodson's GAF score was 60. (*Id.*) On October 31, 2012, Woodson was seen by Dr. Naidu. (*Id*. at 792.) Dr. Naidu found that Woodson was still depressed and had "poor tolerance." (*Id*. at 793.) Dr. Naidu also found that Woodson had an angry attitude. (*Id.*) Woodson was diagnosed with schizoaffective disorder in remission. (Tr. at 794.) His GAF, however, was increased to 70. (*Id.*)

On November 28, 2012, Woodson was seen again by Dr. Osuagwu. (Tr. at 788.) Dr. Osuagwu determined that Woodson had a "low frustration tolerance." (Tr. at 789.) Woodson was agitated at the clinic and was "almost aggressive towards [Dr. Osuagwu]." (*Id.*) Dr. Osuagwu diagnosed Woodson with schizoaffective disorder in remission. (*Id.* at 790.) Woodson's GAF was 65. (*Id*. at 791.) Dr. Osuagwu increased Woodson's dose of Wellbutrin to 200mg. (*Id.*) On January 2, 2013, Woodson was seen again by Dr. Osuagwu. (*Id.* at 777.) Woodson reported that he sometimes would increase his Olanzepine dose when he felt emotionally agitated or irritable, or heard voices. (*Id.*) Woodson asked that his Zyprexa dosage be increased. (*Id.*) The doctor approved the medication increase and added Metformin. (*Id*. at 778.) Woodson's GAF was 65. (*Id*. at 779.) At a January 30, 2013 visit, however, Dr. Osuagwu found Woodson to be "calm" and "fairly well related." (*Id.* at 766.)

At a May 22, 2013 visit Woodson told Dr. Naidu that he felt depressed every day. (*Id*. at 813.) His medications were continued. (Tr. at 814.) Dr. Naidu assigned Woodson a GAF of 55. (*Id.*) In the treatment notes for a June 10, 2013 visit, Dr. Osuagwu noted that Woodson was "consistently" escorted to the clinic by his stepmother, and that Woodson reported that his stepmother helps "keep him in check." (*Id.*) Woodson reported, however, that his only stressor at that time was the denial of his SSI application. (*Id*. at 809.) He was diagnosed with

7

schizoaffective disorder, and assigned a GAF of 65. (*Id.* at 810.) On July 8, 2013, Woodson was seen by Dr. Muhammad Furqan Rizvi. (Tr. at 804.) Dr. Rizvi noted that Woodson was "calm" and "fairly well related." (Tr. at 805.) Woodson was "cooperative, but anxious and impatient." (*Id.*) He assigned Woodson a GAF score of 70, in the "mild" range. (*Id.* at 806.)

An August 21, 2014 opinion by Dr. Nnamdi and Dr. Naidu was submitted to the Appeals Counsel. (*Id.* at 848-52.) They diagnosed Woodson with schizoaffective disorder and determined that he had "moderate-to-marked" limitations in his ability to: remember locations and work-like procedures; understand, remember, and carry out one-to-two step and detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and consistently be punctual; complete a normal workday without interruptions from psychological symptoms; interact appropriately with the public; set realistic goals; and make plans independently. (*Id.* at 848-51.)

Dr. Nnamdi and Dr. Naidu supported their opinion with findings that Woodson presented with an abnormal, constricted and irritable affect, past suicidal ideation, difficulty thinking or concentrating, paranoia/suspiciousness, anhedonia[4]/pervasive loss of interests, appetite disturbances/weight change, personality change, decreased energy, slowed speech, social withdrawal or isolation, auditory hallucinations, and decreased and fragmented sleep (*Id.* at 849.) Woodson's primary symptoms were intermittent auditory hallucinations and paranoid ideations. (*Id.* at 850.) He experienced episodes of deterioration or decompensation in work or work-like settings because of difficulty concentrating. (*Id.*) Woodson's GAF was 55. (*Id.* at 848.) Dr. Naidu and Dr. Nnamdi indicated that the limitations detailed in the questionnaire began on February 1, 2011. (*Id.* at 852.)

---

[4] "Anhedonia," a loss of pleasure in activities, is a symptom associated with depression. 2 Attorneys Medical Deskbook § 25:22.

### a. Radiological Examinations

The record contains the results of two chest x-rays; February 10, 2007, and July 15, 2007; in which doctors found that Woodson's hyper-inflated lungs were consistent with COPD. (Tr. at 376-77.)

### 2. SSA Consultative Examinations

### a. Robert Dickerson, D.O.

On April 28, 2011, Robert Dickerson, D.O., conducted an internal medicine examination of Woodson at the request of the SSA. (Tr. 424-27.) Woodson complained of asthma, schizophrenia, depression, and eczema. (*Id.* at 424.) Dr. Dickerson noted that Woodson was currently prescribed Risperidone, Zolpidem tartrate, Advair Diskus, Clobetasol proprionate ointment, and Denophor ointment. (*Id.* at 424-25.) After a chest examination, he found that Woodson had mild wheezing in both lungs. (*Id.* at 426.) Dr. Dickerson confirmed that Woodson had asthma and eczema, and reported that Woodson's prognosis was fair as to both conditions. (*Id.* at 427.) Dr. Dickerson noted that Woodson should avoid areas where there is aerial dust or debris. (*Id.*)

### b. Haruyo Fujiwaki, Ph.D.

Haruyo Fujiwaki, Ph.D., completed a psychiatric evaluation of Woodson on April 28, 2011. (Tr. at 428-32.) Woodson was accompanied by his stepmother. (*Id.*) Dr. Fujiwaki found that Woodson was cooperative in responding to questions. (*Id.* at 429). He noted that Woodson seemed "coherent and goal directed with no evidence of hallucinations, delusions or paranoia," but found his mood to be "dysthymic[5] and irritable." (*Id.*) Woodson reported to Dr. Fujiwaki that

---

[5] "Dysthymic" refers to symptoms of mild depression. *See Dysthymic,* DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS (2007), http://medical-dictionary.thefreedictionary.com/dysthymic (last visited on April 27, 2016).

he is able to dress, bathe, and groom himself daily, but that his stepmother does "most" of the household chores and that he does not cook, clean, do laundry, or do food shopping. (*Id.* at 430.) Dr. Fujiwaki concluded that "vocationally, [Woodson] is able to follow and understand simple directions and instructions," but would need supervision in handling those tasks and had difficulty maintaining attention and concentration. (*Id.*) Dr. Fujiwaki diagnosed Woodson with mood disorder, depressive disorder, anxiety disorder, and psychotic disorder, and noted that Woodson's prognosis was "guarded." (*Id.*)

**D. Testimony of the Vocational Experts**

Vocational experts Pat Green and Marian Green testified at the February 24, 2012 and August 14, 2013 hearings. (Tr. at 48, 66.) They were asked about a hypothetical claimant with Woodson's age, education, and work experience whose work would be limited to: (1) areas without hazardous machinery; (2) positions that did not require driving; and (3) areas without unprotected heights. (*Id.* at 49, 67) Both experts testified that this hypothetical claimant could not perform work as either a truck driver or bus driver, Woodson's prior work. (*Id.*)  Both experts testified that there were jobs that this hypothetical claimant could do, including hand packager, price marker, and sample gatherer. (Tr. at 49-51, 68.)

**E. Findings of ALJ Mark Solomon**

On September 12, 2013, ALJ Solomon issued his decision that Woodson was not disabled within the meaning of 28 U.S.C. § 1614(a)(3)(A) of the Act and had not been disabled since February 25, 2011, the date Woodson applied for SSI.[6] (Tr. at 24.) The ALJ followed the five-step sequential analysis described in 20 C.F.R. § 416.920. At step one, ALJ Solomon

---

[6] The period at issue runs from February 25, 2011, the date that Woodson filed the application for SSI benefits to September 13, 2013, the date of the ALJ's hearing decision. *See* C.F.R. 28 U.S.C. § 416.335 (The earliest month that SSI benefits may be paid is the month after the application for benefits was filed.)

determined that Woodson had not engaged in substantial gainful activity since February 25, 2011. (*Id.* at 26.) At step two, he found that Woodson had severe impairments that included asthma, schizoaffective disorder, and depression. (*Id.*)

At step three, ALJ Solomon determined that Woodson did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 § C.F.R. Part 404, Subpart P, Appendix 1, and thus Woodson was not presumed disabled. (*Id.*) The ALJ concluded that Woodson's asthma did not meet the requirements of listing 3.03. (*Id.*) The ALJ also found that the severity of Woodson's mental impairments did not meet the criteria of listing 12.04. (*Id.*) The ALJ found that: (1) Woodson only had "mild restriction" in the activities of daily living; (2) Woodson only had "moderate difficulties" with respect to concentration, persistence, pace, and in social functioning; (3) that the "one to two" episodes of decompensation experienced by Woodson did not meet the requirements for "marked limitation" and "repeated" episodes of decompensation; and (4) the record did not support the conclusion that Woodson was unable to "function outside of a highly supportive environment or that even the slightest change in routine would cause a severe decompensation." (*Id.* at 26-27.)

Step four requires that the ALJ determine whether Woodson had the residual functional capacity ("RFC") to perform the requirements of his past relevant work. *Id.* Prior to making a determination at step four, ALJ Solomon assessed Woodson's RFC. (*Id.* at 28.) In making his finding, ALJ Solomon considered all of the symptoms and the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence…" (*Id.*) In considering Woodson's symptoms, the ALJ followed a two-step approach. (*Id.*) The first step was to determine "whether there [was] an underlying medically determinable physical or mental impairment." (*Id.*) Once an underlying physical or mental impairment that

11

could reasonably be expected to produce the claimant's pain or other symptoms had been shown, the ALJ evaluated the "intensity, persistence, and limiting effects of [Woodson's] symptoms to determine the extent to which they limit [Woodson's] functioning." (*Id.*)

In making his determination, the ALJ gave "great weight" to the opinion of consulting physician Dr. Dickerson, finding that Woodson was unrestricted in physical activity, but should avoid environments where there is aerial dust or debris. (*Id.*) The ALJ found that Woodson had only been admitted to the emergency room once for an asthma flare-up, had most recently reported being "asymptomatic," and that his lung examination only revealed "minor wheezing," no "significant chest wall abnormality," and "normal diaphragmatic motion." (*Id.*)

ALJ Solomon gave "very limited weight" to the opinions of Woodson's treating psychiatrists, Dr. Singh and Dr. Agarin. (*Id.* at 29.) He rejected their opinions that Woodson had "marked limitations in [his] ability to complete a normal work week and to get along with coworkers," reasoning that "the actual treatment notes available clearly demonstrate that [Woodson's] condition is fully controlled by medication." (*Id.*) The notes, he continued, "more accurately reflect the claimant's ability to function, [and] belie the marked limitations stated by both doctors." (*Id.*) For example, ALJ Solomon noted that even though the progress note dated January 11, 2012, indicated that Woodson had a history of auditory hallucinations, Woodson denied any depressive, manic or anxiety symptoms. (*Id.*)  The ALJ also noted that the mental status examination contained in that note was "well within normal limits." (*Id.*) Woodson had a GAF of 70 and his cognitive functions were good. (*Id.*)

In contrast, ALJ Soloman gave "great weight" to the medical opinion of Dr. Fujiwaki, the SSA consultative examiner. (*Id.* at 30.) He credited Dr. Fujuwaki's assessment that, although he was "considered irritated and his mood was dysthymic," Woodson's "thought process was …

coherent and goal directed with no evidence of hallucinations, delusions, or paranoia." (*Id.* at 29.) The ALJ credited Dr. Fujiwaki's finding that Woodson's attention and concentration were "only mildly impaired." (*Id.*)

The ALJ also considered the Harlem Hospital records that had been submitted to the Commissioner following the remand from the Appeals Counsel and noted that the records indicated that Woodson had a history of auditory hallucinations and depression, but that the hallucinations would stop when his medications were increased. (*Id.*) The ALJ found that while Woodson requested an increase in medication to curb his hallucinations in July 2012, the medical notes indicated no anxiety and a GAF score of 70. (*Id.*) The ALJ also found that by September 5, 2012, Woodson reported that he was no longer hearing voices, although his depression had not improved. (*Id.*) At that point, Woodson's GAF score was 60, indicating only mild depressive symptoms. (*Id.*)

Accordingly, the ALJ found that Woodson had the RFC to perform a full range of work at all exertional levels but with certain nonexertional limitations. (Tr. at 27.) When the ALJ weighed all of the relevant factors, he found that Woodson's "subjective complaints" did not warrant any additional limitations beyond those established in the RFC. (*Id.*) ALJ Solomon found that Woodson must avoid "working at unprotected heights or with hazardous machinery, must avoid concentrated exposure to respiratory irritants, and [was] limited to simple instructions, rote work, and a low stress environment, defined as one with no close interpersonal contact with the general public." (Tr. at 27-28.)

Finally, at step five the ALJ determined that Woodson was unable to perform any of his past relevant work. (Tr. at 30.) The ALJ found that Woodson should be limited to unskilled work, and thus would not be able to perform the duties of a truck driver or bus driver as they

generally would be performed. (Tr. at 31.) The ALJ found, however, that there were jobs in significant numbers that Woodson could perform even with his limitations. (Tr. at 31-32; *see id.* §§ 416.920(g), 416.969, 416.969(a).) He noted that even with the additional limitation of "only occasional close interpersonal contact with supervisors and coworkers," Woodson was still capable of performing some jobs in the national economy. (*Id.* at 32.) He therefore found that Woodson was not disabled and thus not entitled to SSI. (*Id.*)

## III.   DISCUSSION

### A.  Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d

14

183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g.*, *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's

decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

## B.  Determination of Disability

### 1.  Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

16

of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-

17

9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b). In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49.

The ALJ must consider the entire case record, including objective medical evidence, a claimant's statements about the intensity, persistence, and limiting effects of symptoms, statements and information provided by medical sources, and any other relevant evidence in the claimant's record. SSR 16-3P, 2016 WL 1119029, at *4-6. The evaluation of a claimant's subjective symptoms are not an evaluation of that person's character. *Id.*, at *1.

### 2.     The Treating Physician Rule

The SSA regulations require the Commissioner to evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527(c); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative or non-examining physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("SSA regulations provide a very specific process for evaluating a treating physician's opinion and instruct ALJs to give such opinions 'controlling weight' in all but a limited range of circumstances.").

If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); *Schisler,* 3 F.3d at 567-69. The Commissioner may rely on the opinions of other physicians, even non-examining ones, but the same factors must be weighed. 20 C.F.R. § 416.927(e).

The ALJ is required to explain the weight ultimately given to the opinion of a treating physician. See 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion").  Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 129); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199-200 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion).  The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

Furthermore, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record," especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician. *Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79); *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) ("[A] proper application of the treating physician rule mandates that the ALJ assure that the claimant's medical record is comprehensive and complete."). Similarly, "if an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative

record accordingly." *Hartnet v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998), *accord Rosa*, 168 F.3d at 79.

Finally, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the *pro se* claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

## C.   Issues on Appeal

On appeal, Woodson alleges that ALJ Solomon erred when he (1) failed to assign controlling weight to Woodson's treating physicians, and (2) failed to properly evaluate Woodson's credibility. He argues that these errors, and the Appeals Counsel's failure to consider new evidence, warrant remand to the agency for further proceedings. (Pl. Mem. at 13-20.) The Commissioner maintains that the ALJ applied the correct legal principles in reaching his decision and that the decision is supported by substantial evidence. (Def. Mem. at 1.)

### 1.   The ALJ Did Not Properly Apply the Treating Physician Rule

ALJ Soloman failed to properly apply the treating physician rule when he assigned the opinions of Woodson's treating psychiatrists "very limited weight." He supported his decision by explaining that the "actual medical treatment notes, which more accurately reflect [Woodson's] ability to function, belie[d] the marked limitations stated by [Dr. Singh and Dr. Agarin]." (Tr. at 29.) He further determined that treatment notes "clearly demonstrate that [Woodson's] condition is fully controlled by medication." (*Id.*) In so finding, ALJ Soloman did not consider whether the opinions were supported by medically acceptable clinical diagnostic techniques, nor did he

properly evaluate whether the opinions were consistent with other substantial evidence in the

record. 20 C.F.R. § 416.927(c)(2). Rather, he "arbitrarily substitute[d] his own judgment of the

medical proof" when he found that Woodson's condition was fully controlled by medication,

based on his own review of the medical records, *Balsamo*, 142 F.3d at 81, and cherry-picked

evidence in support of his own conclusions. *See Correale-Englehart v. Astrue*, 687 F.Supp.2d

396, 439 (ALJ improperly "cherry-picked [medical evidence]… that minimized plaintiff's

psychological limitations… and ignored" other evidence).

The treating physicians' opinions were consistent with their treatment notes and other

evidence in the record, which indicated that Woodson's psychiatric symptoms fluctuated over

time. In deciding that the treatment notes "belie[d]" the limitations imposed by the doctors, ALJ

Solomon focused his review of the record on notes taken on Woodson's "good days," and

ignored evidence that demonstrated Woodson's lower functioning days. (*See, e.g.*, Tr. at 665,

698 (noting constructed affect and mild paranoia); 706, 710 (noting that Woodson had an easily

irritable attitude and low frustration tolerance); 789, 790 (noting incident wherein Woodson

almost became "aggressive" toward Dr. Osuagwu); 808 (noting that Woodson's stepmother

would accompany him outside of their home because he would get easily "agitated and violent"

if provoked by others).)

Moreover, as the regulations and case law make clear, the ALJ was obligated to consider

the factors set forth in 20 C.F.R. § 404.1527(c) with sufficient particularity for the reviewing

court to determine whether the assignment of weight, if not controlling, was based on "good

reasons." *Gunter,* 361 Fed. Appx. at 199. Here, the ALJ did not explain how the long duration of

Woodson's treatment at Harlem Hospital, the particularized nature of Woodson's treatment for

severe psychiatric impairment, or both doctors' psychiatric board certifications factored into his

assignment of "very limited weight." Indeed, these factors appear to contradict his weight assignment.

The ALJ also based his conclusions on the findings of one-time examining physician Dr. Fujiwaki, whose opinion he assigned "great weight." (Tr. at 29.) The Second Circuit has consistently refused to uphold an ALJ's decision to reject a treating physician's diagnosis because other examiners reported dissimilar findings. *See Rosa*, 168 F.3d at 81 (rejecting the Commissioner's reliance on the consulting physicians' opinions merely because they were inconsistent with those of the treating physician, and did not identify any serious impairments); *Carroll v. Sec. of Health and Human Services,* 705 F.2d 638, 643 (2d Cir. 1983) (holding that it was improper for the ALJ to disregard the finding of the treating physician because the three remaining doctors who examined the claimant reached no such conclusions); *see also Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1999) (The Commissioner's burden "to offer positive evidence that plaintiff can … work … is not carried merely by pointing to evidence that is consistent with his otherwise unsupported assertion."). It is particularly problematic for an ALJ to rely on such an opinion where, as here, the claimant's symptoms fluctuate over good days and bad days. *See Crespo v. Apfel*, 97 Civ. 4777 (MGC), 1999 U.S. Dist. LEXIS 2953, *19-20 (S.D.N.Y., Mar. 17, 1999) ("In making a substantial evidence evaluation, a consulting physician's opinion or report should be given limited weight" because they are "often brief, are generally performed without benefit or review of the claimant's medical history and, at best, only give a glimpse of the claimant on a single day.").

Accordingly, the Court finds that remand to the Commissioner is warranted for proper application of the treating physician rule to the opinions of Woodson's treating physicians.

### 2.    The ALJ Failed to Properly Assess Woodson's Symptoms

Woodson also argues that the ALJ failed to follow the two-step analysis mandated by 20 C.F.R. § 404.1529 when assessing the intensity and persistence of his subjective symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b). The ALJ elicited testimony at two hearings regarding Woodson's subjective symptoms and limitations. At both hearings, Woodson testified that he is unable to leave home without his stepmother because of his paranoia. (*See* Tr. at 43, 63.) Woodson also testified that even when accompanied by his stepmother he would "get to fighting with people." (*Id*. at 46.) Woodson testified that he would get nervous around others and experience anxiety symptoms such as heart palpitations, sweating, trembling and shortness of breath. (*Id.*) The ALJ classified Woodson as being mildly "restrict[ed]" in activities of daily living and as having "moderate difficulties" in social functioning. (*Id*. at 27.) Although ALJ Solomon concluded that Woodson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he found that Woodson's statements during the hearings regarding the "intensity, persistence and limiting effects of [his] symptoms [were] not credible to the extent that they are inconsistent with the [RFC]." (Tr. at 30.)

Woodson argues that courts in this Circuit have rejected the use of such boilerplate language. (Pl. Mem at 19, citing *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451 (PAC) (SN), 2014 WL 1265918, at *17-18 (S.D.N.Y. Mar. 27, 2014)). In *Emerson*, the court found that the "methodology described by the ALJ to explain his credibility determination strongly suggest[ed] that he weighed the objective medical evidence against the inability to work." *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451 (PAC) (SN), 2014 WL 1265918, at *17-18 (S.D.N.Y. Mar. 27, 2014). The Court noted that the Seventh Circuit has also rejected this approach, finding that it "gets things backwards" because it "implies that ability to work is determined first and is

24

then used to determine the claimant's credibility." *Id.* citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). *See also Otero v. Colvin*, 12 Civ. 04757 (JG), 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013) ("[I]t makes little sense to decide on a claimant's RFC prior to assessing her credibility. It merely compounds the error to then use that RFC to conclude that a claimant's subjective complaints are unworthy of belief.").

The Court agrees that ALJ Solomon's approach was improper. After finding that Woodson's subjective complaints could be reasonably expected to cause his "alleged symptoms," ALJ Solomon was required to evaluate the intensity of those complaints in light of the entire case record and use that evaluation to determine Woodson's RFC. (Tr. at 30.); *Echevarria v. Apfel*, 1999 U.S. Dist. LEXIS 5545 at *22 (S.D.N.Y. Mar. 18, 1999) (citing 20 C.F.R. §§ 404.1529(b), 416.929(b)); SSR 16-3P, 2016 WL 1119029, at *4-6. The ALJ failed to do so and remand is therefore warranted for further investigation into the limiting effect of Woodson's impairments, particularly with respect to his alleged difficulties engaging with others.

### 3.    Evidence Submitted to the Appeals Counsel

Woodson further argues that two opinions submitted to the Appeals Counsel from his treating psychiatrists, Dr. Naidu and Dr. Nnamdi, were new and material evidence that justify remand to the Commissioner for further proceedings. (Pl. Mem. at 20-21.) Because the Court has already found two bases for remand, it does not address this argument.

### D.  Remand Is the Appropriate Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing.  Remand may be appropriate if "the ALJ has applied an improper legal standard." *Rosa*, 168 F.2d at 82-83.  Moreover, where an

ALJ has committed a legal error that may have affected the disposition of the case, such a failure constitutes a reversible error. *Pollard*, 377 F.3d at 189. Here, ALJ Solomon committed legal error when he failed to follow the framework of (1) the treating physician rule, 20 C.F.R. § 404.1527, in assigning weight to Woodson's treating psychologists; and (2) 20 C.F.R. § 404.1529(b), in assessing the limiting effect of Woodson's impairments in social functioning. The proper application of these rules could have affected the Commissioner's ultimate finding of disability. The Court, therefore, rejects the ALJ's decision and remands for rehearing.

## IV.   CONCLUSION

For the reasons set forth above, the Court **GRANTS** Woodson's motion for judgment on the pleadings, **DENIES** the Commissioner's cross motion, and **REMANDS** this case to the Commissioner for reconsideration in accordance with this Opinion. On remand, the ALJ must correctly apply the standards of 20 C.F.R. § 404.1527 when weighing the opinions of Woodson's treating psychiatrists, and to assess the limiting effects of Woodson's impairments in social functioning pursuant to 20 C.F.R. § 404.1529(b). The Clerk of Court is directed to enter judgment.

**SO ORDERED this 10th day of August 2016**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

26